IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH VINCENT SISNEROS,<br><br>               Petitioner,<br><br>vs.<br><br>ROBERT NEUSHMID, Acting Warden,<br>California State Prison, Solano,[1]<br><br>               Respondent. | No. 2:17-cv-01499-JKS<br><br>MEMORANDUM DECISION |

Joseph Vincent Sisneros, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Sisneros is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at California State Prison, Solano. Respondent has answered, and Sisneros has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On December 29, 2010, Sisneros, along with co-defendants Jose Antonio Duran and Salvador Benjamin Vasquez, Jr., was charged with conspiracy to commit robbery (Count 1); second-degree robbery (Count 2); two counts of battery causing serious injury (Counts 3 and 4); dissuading a witness (Count 5); two counts of threats to commit a crime resulting in death or great bodily injury (Counts 6 and 10); two counts of assault by means of force likely to produce great bodily injury (Counts 7 and 9); and participating in criminal street gang activity (Count 11).[2] The information further alleged that the crimes charged in Counts 1 through 10 were

---

[1]     Robert Neushmid is substituted for Eric Arnold as acting Warden, California State Prison, Solano. Fed. R. Civ. P. 25(d).

[2]     Duran was charged individually in Count 8 with committing the crime of drawing and exhibiting a deadly weapon other than a firearm in furtherance of a criminal street gang

committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members. As to Counts 1, 2, 4, and 9, it was additionally alleged that all three defendants inflicted great bodily injuries when they committed the charged offenses.[3] All three defendants pleaded not guilty and denied the allegations. They proceeded to a joint jury trial on February 7, 2012. On direct appeal of Sisneros' conviction, the California Court of Appeal laid out the following facts underlying the charges against Sisneros and the evidence presented at trial:

*The Assault and Robbery of Noah Fordyce*

After getting off work around 10:00 p.m. on April 19, 2010, Noah Fordyce purchased some nachos and drove to the Lowe's parking lot in West Sacramento. He parked and began eating while he watched a show on his iPod. The driver's side window of his car was down, and Fordyce's seatbelt was still buckled.

A red car occupied by several men pulled into the parking lot and parked behind Fordyce's car. Three men got out of the red car and came to Fordyce's driver's side window. They told him they had been drinking, and one of the men grabbed a nacho chip from Fordyce's food. The three men then returned to their car.

A few minutes later, the three men returned to Fordyce's window. One man reached in and grabbed Fordyce's iPod. The men began taking turns violently punching Fordyce in the head. While doing so, the men yelled out "Los Nortenos" or "Los Nortes" multiple times. One of the men said he had a knife. They demanded Fordyce's wallet and keys. Fordyce did not fight back and tried to cover his head from the blows, which continued even after he gave them his wallet and keys. During the assault, Fordyce's nachos were smeared on the inside and outside of his vehicle. Among other injuries, Fordyce suffered two facial bone fractures in the unprovoked attack.

*The Assault of Carlos Lozano*

While the three men were taking turns hitting Fordyce, four Lowe's employees, Rick Deanda, Chantelle Parr, Camden Cushing, and Carlos Lozano, walked out of the Lowe's store, which was closing. They immediately noticed a commotion and yelling coming from the direction of Fordyce's vehicle. They saw three men attacking Fordyce

activity.

[3]      As to Counts 2, 5, and 7, it was alleged that Duran personally used a deadly weapon to commit the charged offenses.

through his car window.  One man was wearing a black sweatshirt or shirt, another was wearing a white hooded sweatshirt, and the third man was wearing a white shirt.

Deanda, the store manager, instructed the employees to stay away and to call the police.  Deanda heard the word "Norte" yelled out during the attack on Fordyce.

Cushing called 911 to report the attack.  While Cushing was on the phone with the 911 operator, one of the men accosting Fordyce noticed him on the phone and yelled out that Cushing was "calling the cops."  The three men then got into their car and sped quickly towards Cushing.  The man wearing the white hooded sweatshirt was driving.  While the three men were distracted by the Lowe's employees, Fordyce got out of his car and ran to hide by the Lowe's store.

Cushing stepped behind a nearby light pole to put something between him and the car.  After the car abruptly stopped, the three men jumped out and began yelling at Cushing, asking him, "You calling the cops on us, fucking Nigga, fucking Norte?"  All three men were yelling at Cushing.  The man wearing the black sweatshirt told Cushing, "I'll fucking shoot you.  I got a fucking gun, Nigga.  I'll fucking shoot you.  You calling the cops on me?"  Cushing saw the man holding a dark object near his waistband, which Cushing thought was a gun.  While the man was threatening him, the other two men began running towards Cushing.  Cushing turned and ran towards the parking lot exit.

Lozano was standing a short distance behind Cushing at the time.  Frightened, Lozano stood still and put up his hands to signal that he did not want any problems.  The two men chasing Cushing, however, began attacking Lozano instead.  They kicked and punched him in the chest and face.  The man wearing the black sweatshirt stood back while the other two men attacked Lozano.  Lozano heard someone yell, "Norteno."  The men eventually stopped assaulting Lozano, got into their car, and drove away.  As a result of the attack, Lozano suffered injuries to his nose, eyes, and face.

Parr walked quickly towards her car.  She heard one of the men screaming that he was "going [to] kill this nigga," and another yelling "Norte."  She saw the three men get into their car and drive towards Cushing and Lozano.  She saw at least two of the three men attack Lozano.  She drove out of the parking lot and then pulled over to call the police.  While leaving, she saw two other men standing on the road near the parking lot exit.  One was wearing a dark shirt and long jeans shorts, and the other was wearing a white shirt with a cartoon figure on it.

As Parr was on the phone with the police, she saw the red car drive by on the street.  The man in the white hooded sweatshirt was driving, and the man with the white cartoon shirt, whom Parr had seen on the side of the road, was also in the car.

Minutes later, an officer called to the location of the assaults passed a red car matching the description of the suspects' vehicle.  The officer stopped the car and saw the passenger in the backseat on the right moving around and throwing things out of the window.  Luis Vasquez, defendant Vasquez's brother, was sitting in the right rear passenger seat.  Duran was driving the car, and Vasquez was sitting in the front passenger seat.  Ryan Boyd, also known as Ryan White or Derek White, was sitting in the center of the backseat, and Sisneros was sitting in the left rear passenger seat.

At the time, Duran was wearing a white hooded sweatshirt and was carrying a knife.  Sisneros was wearing a white shirt that had a nacho cheese stain on the front.

Vasquez was wearing a black shirt, which may have had the sleeves pushed up. Luis Vasquez was wearing a black sweater, and Ryan Boyd was wearing a white shirt with a cartoon logo on it. None of the men had changed their clothes since being arrested.

Upon searching the car, authorities found Fordyce's iPod and wallet, which were located on the floorboard under the driver's seat. A pair of jeans shorts with a red belt were in the backseat.

*Witness Identifications and Police Interrogations*

The suspects were taken to a nearby location for a "field showup." Fordyce was unable to identify any of the men, but did identify the red car as the one in which his attackers were riding. Cushing identified Duran, Vasquez, and Sisneros as the men who attacked Fordyce and Lozano. Parr identified Duran and Vasquez as two of the primary assailants. She also identified Duran as the driver of the red car. Lozano identified Duran, Vasquez, and Sisneros as the men who assaulted him.

Thereafter, the police interviewed each defendant separately on videotape following standard *Miranda* warnings. (*Miranda v. Arizona* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (*Miranda*).) The interviews of Sisneros and Duran were played for the jury; the court prohibited the People from playing Vasquez's taped interview because he invoked his Miranda rights when the interview began.

Sisneros told police he was passed out drunk in the backseat of Duran's car during the attack and that he never hit anyone. He could not explain how the nacho cheese stain got on his shirt. When asked why his left hand was bruised and swollen, Sisneros, who was left handed, claimed his knuckles always looked that way.

In response to the interrogating officer's statement, "So, you're a norteno," Sisneros stated, "If I was to get locked up, I'd ride with northerners, yeah." Sisneros also told the officer that his "family was always northerner," and that he "just hood bang[s]." After the officer asked him whether he was a Norteno from Del Paso Heights, Sisneros responded that if he were "representing" himself, he "would go as a northerner, yeah. Northerner from the heights." Sisneros also admitted he knew Frank White, a well-documented Norteno gang member.

Duran admitted the red car was his and that he was driving the car that night. When asked how long he had been a Norteno, Duran responded, "Who said I was?" The officer then told Duran that apparently he had admitted being a Norteno gang member to someone in Sacramento. Duran also said he was "not proud of it" in response to the officer's question of whether he was proud of being a Norteno. He later denied being a gang member, however, and said he was not with any particular Norteno crew. When asked why his hands and knuckles were bruised, Duran claimed that his hands always looked that way. Towards the end of the interview, Duran yelled out "Norte" while attempting to communicate with another suspect in the room next door.

*Trial Proceedings*

A December 2010 information charged Duran, Vasquez, and Sisneros with the following: conspiracy to commit robbery (§ 182, subd. (a)(1); count 1), second degree robbery (§ 211; count 2), battery with serious bodily injury of Fordyce (§ 243, subd. (d);

count 3), assault with force likely to cause great bodily injury of Fordyce (§ 245, subd. (a)(1); count 4), dissuading a witness (§ 136.1, subd. (c)(1); count 5), criminal threats against Cushing (§ 422; count 6), assault with force likely to cause great bodily injury of Cushing (§ 245, subd. (a)(1); count 7), battery with serious bodily injury of Lozano (§ 243, subd. (d); count 8), assault with force likely to cause great bodily injury of Lozano (§ 245, subd. (a)(1); count 9), criminal threats against Lozano (§ 422; count 10), and active participation in a criminal street gang (§ 186.22, subd. (a); count 11). Duran was charged individually in count 12 with drawing and exhibiting a deadly weapon other than a firearm in furtherance of criminal street gang activity, but this count was later dismissed. (§§ 186.22, subd. (d), 417, subd. (a)(1).)

Several enhancements were alleged relating to the substantive offenses. For counts 1 through 10, the information alleged defendants had committed the crimes for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members. (§ 186.22, subd. (b)(1).) For counts 1, 2, 4 and 9, it was further alleged that all three defendants inflicted great bodily injury when they committed the charged offenses. (§ 12022.7, subd. (a).) And, for counts 2, 5, and 7, it was alleged Duran personally used a deadly weapon. (§ 12022, subd. (b)(1).) Defendants pleaded not guilty to all of the charges and enhancements.

*The Prosecution Case*

At trial, Fordyce, Deanda, Cushing, Lozano, and Parr testified about the above described events. Fordyce testified that the three men shouted out "Los Nortenos" or "Los Nortes" in a way that Fordyce was supposed to remember it.

Parr testified she was familiar with gangs having grown up in a neighborhood with numerous Norteno gang members, and understood the term "Norte" to be a gang-related term that referred to the Norteno criminal street gang. She feared retaliation for testifying. Although, during the field lineup at the time of the incident, she had identified Duran as the car driver wearing the white hooded sweatshirt and Vasquez as the man wearing the black shirt and jeans, who were two of the primary assailants, she was unable to identify any of the defendants at the time of trial.

Cushing, who was a military police officer, was also familiar with the term "Norte" from gang training he received from the FBI and the Department of Homeland Security. Based on his training, he believed the attacks on Fordyce and Lozano were gang related. He was afraid to testify because he feared gang retaliation.

At trial, Cushing identified all three defendants as the men who attacked Fordyce and Lozano. He specifically identified Vasquez as the man wearing the black sweatshirt who threatened to shoot him. Similarly, Lozano testified that Vasquez was the man in black who threatened to shoot him and Cushing. He identified Duran and Sisneros as the men who actually punched and kicked him. At the time of the attack, Lozano understood the term "Norteno" to be gang related, and he felt increased fear and intimidation as a result.

Detective John Sample, a veteran officer with the Sacramento Police Department, testified as the People's gang expert. Detective Sample had investigated hundreds of

Hispanic criminal street gang crimes, and talked with or otherwise came in contact with Hispanic gang members on a daily basis. He had received specialized training in Hispanic criminal street gangs throughout his law enforcement career, and predominantly investigated the Norteno and Sureno criminal street gangs. He also talked with other officers about gang issues, reviewed gang reports from other jurisdictions, and reviewed field identification cards identifying gang members in the Sacramento area.

Detective Sample testified regarding Hispanic criminal street gangs generally, and about the "primary activities" of the Norteno gang specifically, including murder, assault with a deadly weapon, robbery, narcotics trafficking, firearms offenses, and weapons violations. The Norteno criminal street gang originated from a prison gang called Nuestra Familia. There are approximately 1,500 validated Norteno gang members in the Sacramento region, generally organized into sets or subsets based on the neighborhoods in which the gang members live. Some of these subsets include the Richardson Village Nortenos and Del Paso Heights Nortenos in North Sacramento as well as the Broderick Boys in West Sacramento, among several others.

These different Norteno subsets often hang out together and commit crimes together, including Richardson Village Nortenos and Norteno gang members from West Sacramento. According to Detective Sample, a Norteno gang member's first allegiance is to the Norteno gang itself, aside from their set or subset. Thus, a crime committed by a Del Paso Heights Norteno or a West Sacramento Broderick Boys benefits not only the other Norteno subsets but also the larger Norteno criminal street gang as a whole.

Common Norteno gang signs and symbols among all subsets of Nortenos include the color red, the words Norte or Northerner, the letter N, which is the 14th letter of the alphabet, the number 14 or any variation of that number including the numbers one and four, roman numerals XIV, or one dot and four dots. Norteno gang members often use hand signs to show their gang affiliation.

Detective Sample testified that in gang culture, respect is like street currency. Respect in a gang is obtained by committing crimes and other acts of fear or intimidation. Gang members "put in work" for the gang, meaning they commit crimes, to show their loyalty to the gang and to raise their status within the gang. Violent gang crimes intimidate members of the community from reporting crimes, which allows gangs to operate without inhibition.

Detective Sample opined that Sisneros, Vasquez, and Duran were all active Norteno criminal street gang members. He based his opinion about Sisneros on several factors, including that Sisneros was involved in the present crimes, which Detective Sample believed were gang related. Sisneros had also been found in the company of other Norteno gang members on multiple occasions, was documented wearing red gang-related clothing, and he admitted during the police investigation of the charged crimes that he "hood bangs" with Northerners and that his family members were Norteno gang members. Detective Sample also considered Sisneros's responses to jail classification questions where he said he hangs with Northerners, although he denied being a gang member.

For Vasquez, Detective Sample noted that the Sacramento Police Department had contacted him on multiple occasions associating with Norteno gang members, including

during a 2009 homicide investigation. During those contacts, Vasquez was wearing red clothing consistent with Norteno-style dress. Vasquez had a tattoo on his chest of the letters "RVN," which Vasquez admitted stood for the Richardson Village Nortenos, a Norteno subset from Del Paso Heights. Three months before the attacks on Fordyce and Lozano, Vasquez had been shot three times while attending a gang-related party. In response to jail booking questions, Vasquez said he hangs with Northerners, although, like Sisneros, Vasquez denied any gang affiliation.

Photographs of Vasquez with other Norteno gang members, including one with Ryan Boyd (also known as Ryan White or Derek White), who was arrested with defendants, were posted on Vasquez's personal MySpace Web page as well as on a Richardson Village Norteno MySpace Web page. Some of the photographs depict Richardson Village Nortenos together with Norteno gang members from West Sacramento. Vasquez and the others are wearing red clothing and throwing gang signs with their hands. Several of the pictures were taken at the funeral of documented Norteno gang member, Frank White.

Finally, in opining Vasquez was an active member of the Norteno criminal street gang, Detective Sample considered a jail incident that occurred while Vasquez was awaiting trial. Vasquez appeared to give a small, written jail communication known as a "kite" to another inmate. The jail kite contained information about Norteno "curriculum" that included a structured training process for the gang.

Detective Sample testified that he had seen other confiscated kites, in both jail and prison, showing Norteno rosters of gang members within the facilities. Some kite rosters listed both Richardson Village Nortenos and Del Paso Heights Nortenos together.

For Duran, Detective Sample cited his "yes" answer on the jail classification questionnaire in response to a question asking if he had any gang affiliation. Duran listed "Northerner" on the form. While Duran was awaiting trial on the present charges, he and several other incarcerated Norteno gang members assaulted another jail inmate who wanted to drop out of the Norteno gang.

In concluding Duran was an active gang member, Detective Sample also considered the circumstances surrounding Duran's juvenile adjudication for robbery with a firearm. Duran and several Norteno gang members tied up a man, used derogatory terms for a rival Sureno gang member, and threatened to kill him if he did not give them his ATM card and PIN to withdraw money from the man's bank account. The investigation into the crime revealed the motive for the robbery was to obtain money to post bail for a Norteno gang member who had been arrested for stealing a car. [Duran] was arrested in a house with Norteno gang graffiti and was wearing red clothing at the time. He also told investigators that he only hangs out with Norteno gang members.

The other two men who were in the car when defendants were arrested, Ryan Boyd and Luis Vasquez, were also Norteno gang members in Detective Sample's opinion. Boyd's gang monikers were Ryno or Chap or Chappy, and he had been contacted by the police on numerous occasions associating with known Norteno gang members while wearing a red bandana, an item commonly worn by Norteno gang members. Detective Sample knew Boyd through other criminal gang investigations and had written several reports about him. Boyd was the victim of a gang-related stabbing.

Searches of his residence revealed Norteno gang graffiti, and Boyd's mother told Detective Sample that Boyd considers himself a Norteno. He also appeared in photographs with other Norteno gang members, including one picture in which Vasquez was seen throwing gang signs.

Luis Vasquez, defendant Vasquez's brother, had been documented by the Sacramento Police Department in multiple reports as associating with known Norteno gang members. He was photographed wearing red gang clothing, and, like his brother, the letters "RVN" were tattooed across his stomach.

The prosecution presented evidence of three predicate offenses during trial. The first predicate offense, known as the Memorial Park incident, occurred in March 2010. Two brothers were assaulted by multiple Norteno gang members in a West Sacramento park. One of the brothers was hit in the head with a hammer while the other was chased down and severely beaten. During the attack the Norteno gang members yelled out "Broderick," referring to the West Sacramento "Broderick Boys" Norteno subset.

The second predicate offense occurred when the same Norteno gang members involved in the Memorial Park incident tried to later intimidate the brothers and their family members by driving by their house while making shooting motions and threats. At least one of the gang members was convicted of committing an assault with a deadly weapon or with force likely to produce great bodily injury (§ 245).

Detective Sample testified about a third predicate offense, a murder committed by a validated Norteno gang member in 2007. The Norteno gang member was not affiliated with any particular Norteno set when he shot and killed an individual whom he believed was a rival gang member.

The prosecutor posed several hypothetical questions to Detective Sample tracking the evidence presented in the case. Detective Sample opined that the hypothetical crimes as described, including that the persons shouted "Norte" during the robbery and assaults, would benefit or promote the Norteno criminal street gang by informing the victims who was committing the crimes and that the gang members were violent. This would intimidate the witnesses and instill fear in the community, making it less likely the crimes would be reported. Over defense objections, the prosecutor also asked Detective Sample whether the hypothetical gang members involved in such crimes intended to further or assist the criminal street gang. Detective Sample responded that the hypothetical defendants, in his opinion, would intend their actions to promote or assist the gang.

*The Defense Case*

None of the defendants testified. During closing, Duran's counsel argued the crimes were not gang related, but rather crimes of opportunity committed by a group of young people who had been partying but not otherwise associating as Norteno gang members. Similarly, Sisneros characterized defendants as a group of drunken young people who simply committed a crime of opportunity. Although his counsel acknowledged that Sisneros "ran with the Northerners," he denied the offenses were committed on behalf of the Norteno criminal street gang. Vasquez's counsel conceded that three men had committed various crimes, but argued that those men were Duran,

Sisneros, and Luis Vasquez–not defendant Vasquez. He also argued that the crimes were not gang related.

*People v. Vasquez*, 202 Cal. Rptr. 3d 743, 745-52 (Cal. Ct. App. 2016).

At the conclusion of trial, the jury found Sisneros guilty of Counts 1-5 and 8, 9, 11, and also found true the allegations attached to those counts.[4] Sisneros was subsequently sentenced to an aggregate term of 22 years to life imprisonment.[5]

Through counsel, Sisneros appealed his conviction, arguing that: 1) the trial erred in sentencing him to an indeterminate term of 7 years to life imprisonment because the jury did not find true the special finding attached to Count 5 that he dissuaded Cushing from reporting the attack on Fordye by using force, violence, or the threat of force or violence; 2) there was insufficient evidence to support his conviction for Count 5 because he neither directly used or threatened to use force against Cushing to stop him from reporting the crimes, nor aided or abetted Vasquez in doing so; 3) the trial court erred when it allowed the State's gang expert, Detective Sample, to testify regarding Duran's Juvenile 211 adjudication, which had been excluded as a predicate crime; 4) the court's allowing Detective Sample to testify to out-of-court statements about Duran's juvenile robbery adjudication violated Sisneros' right to confrontation; 5) there was insufficient evidence to support his conviction for active gang participation; 6) the

---

[4] Each of the defendants were acquitted of one count of assault by means of force likely to produce great bodily injury (Count 7), and Sisneros and Duran were acquitted of two counts of criminal threats (Counts 6 and 10). Prior to deliberations, the prosecution dismissed Count 12 against Duran as well as the special allegations attached to Counts 2 and 5 that Duran personally used a deadly or dangerous weapon when robbing Fordyce and dissuading Cushing from reporting the crime.

[5] The court sentenced Vasquez to an aggregate term of 25 years 4 months to life imprisonment. Duran was sentenced to an aggregate term of 28 years 8 months to life imprisonment.

trial court erred in failing to dismiss the entire jury venire based on a prospective juror's statement during voir dire indicating that the juror had looked up the defendants' criminal histories; and 7) Sisneros was incorrectly sentenced because the robbery and the dissuading a witness count were subject to a stay under California Penal Code § 654[6] as a single course of conduct.  Sisneros additionally joined in Vasquez's opening brief.

Counsel for Vasquez additionally filed a supplemental brief arguing that trial counsel was ineffective for failing to object to the lack of the required special finding attached to Count 5 that he dissuaded Cushing from reporting the attack on Fordye by using force, violence, or the threat of force or violence.  Counsel for Sisneros joined in that argument.  Counsel for Duran also filed a supplemental brief arguing that the trial court violated his rights against self-incrimination by admitting evidence of Duran's un-*Mirandized* statement to law enforcement that he was a gang member.  Counsel for Sisneros likewise joined in that argument.

After briefing was completed, the California Supreme Court decided *People v. Prunty*, 355 P.3d 480, 483 (Cal. 2015), concerning the proof necessary to establish the existence of a criminal street gang and holding that the prosecution is required "to introduce evidence showing an associational or organizational connection that unites members of a putative criminal street gang."  The Court of Appeal directed the parties to brief the effect of *Prunty*, if any, on the defendants' appeal.  In response to the court's order, Sisneros argued that, in light of *Prunty*, there was insufficient evidence to demonstrate the requisite showing of "organizational or

---

[6]       Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  CAL. PENAL CODE § 654.

associational connection" needed for the jury to reasonably infer that Sisneros belonged to the same criminal street gang as the men who had committed the predicate offenses.

On May 25, 2016, the Court of Appeal issued a reasoned, partially published opinion affirming the judgment against Sisneros in its entirety.[7] *Vasquez*, 202 Cal. Rptr. 3d at 757. Sisneros filed in the California Supreme Court a counseled petition requesting review of his claims that: 1) the jury did not find true the special finding attached to Count 5; 2) the trial court erred when it allowed Detective Sample to testify regarding Duran's Juvenile 211 adjudication; 3) Detective Sample's testimony about Duran's juvenile robbery adjudication violated Sisneros' right to confrontation; 4) the Court of Appeals used the wrong harmless error standard when adjudicating his claim that his confrontation rights were violated by the admission of the defendants' booking statements; 5) there was insufficient evidence to support his conviction for dissuading a witness by threat of force; 6) there was insufficient evidence to support the substantive gang crime conviction; and 7) there was insufficient evidence to establish the gang enhancement. The Supreme Court denied review on September 14, 2016.

Sisneros then timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on July 15, 2017. Docket No. 1; *see* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Sisnero brings the seven claims he raised to the California Supreme Court in his petition for review on direct appeal: 1) the jury did not find true the special finding attached to Count 5; 2) the trial court erred when it allowed Detective Sample

---

[7] The judgments against Vasquez and Duran were likewise unanimously affirmed. *Vasquez*, 202 Cal. Rptr. 3d at 757.

to testify regarding Duran's Juvenile 211 adjudication; 3) Detective Sample's testimony about Duran's juvenile robbery adjudication violated Sisneros' right to confrontation; 4) the Court of Appeals used the wrong harmless doubt standard when adjudicating his claim that his confrontation rights were violated by the admission of the defendants' booking statements; 5) there was insufficient evidence to support his conviction for dissuading a witness by threat of force; 6) there was insufficient evidence to support the substantive gang crime conviction; and 7) there was insufficient evidence to establish the gang enhancement.

### III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

## A.     Sentencing Error/No Special Finding (Ground 1)

Sisneros first argued that the jury failed to make a special finding that he committed the

crime of dissuading a witness by force, violence, or a threat of violence.  In considering this

claim on direct appeal, the California Court of Appeal laid out the following factual background:

> In this case, the information charged each defendant with violating section
> 136.1,subdivision (c)(1) by dissuading Cushing, who witnessed defendants viciously
> attacking Fordyce, from reporting the crime to police.  The information specifically
> alleged that *all three defendants* dissuaded Cushing "by force, and by the express and
> implied threat of force and violence . . . ."
>
> The court instructed the jury that if jurors found defendants guilty of intimidating
> a witness in violation of section 136.1, subdivision (c)(1), then jurors had to decide
> whether the People had proved the additional allegation that defendants used or
> threatened to use force when doing so.  To prove this allegation, the court instructed the
> jury that the People had to "prove that the defendant used or threatened, either directly or
> indirectly, to use force or violence on the person or property of a witness or any other
> person."
>
> The court further instructed the jury that it "must separately consider the evidence
> as it applies to each defendant.  You must decide each charge for each defendant
> separately.  If you cannot reach a verdict on all of the defendants, or on any of the
> charges against any defendant, you must report your disagreement to the court and you
> must return your verdict on any defendant or charge on which you have unanimously
> agreed.  [¶] Unless I tell you otherwise, all instructions apply to each defendant."
>
> The jury received separate written verdict forms relating to dissuading a witness
> as alleged in count 5 for each defendant.  Each verdict form included a caption
> identifying the individual defendant to whom the respective verdict form applied.  The
> jury marked the guilty box on each defendant's respective verdict form for count 5.
>
> The jury also received separate written special finding forms for each defendant
> on count 5.  As with the count 5 verdict forms, each special finding form includes a
> caption identifying the individual defendant to whom the respective special finding form
> applied.  Each special finding form contained the following text:

>> "We, the Jury sworn to try the above-entitled case, find the special finding
>> that the Defendant SALVADOR BENJAMIN VASQUEZ JR, committed the
>> felony charged in Count 5, that the felony violation of Penal Code [section] 136.1
>> was malicious and done with force or violence or the threat of force or violence as
>> required by California Penal Code 136.1(c) to be:

>> "[X] TRUE [ ] NOT TRUE."

Thus, although there is a count 5 special finding form separately captioned for each defendant, the text of each of the three forms refers to defendant Vasquez only.

Docket No. 16-1 (Appellate Decision) at 16-17.

Sisneros argues, as he did on direct appeal, that the jury did not find that he used force or violence or threatened to use force or violence when intimidating Cushing; rather, he contends that the jury made the special finding three separate times as to Vasquez. But as the Court of Appeal reasonably concluded, "the record reveals an obvious error in the written special finding forms for Duran and Sisneros." *Id.* at 17. There is ample record support for this conclusion, as explained by the Court of Appeal:

First, there would be no need for the jury to make the identical special finding for Vasquez three separate times. Second, nothing in the record shows that the jury could not reach a decision on the special finding regarding the use of force or threat of force alleged against Duran and Sisneros in the information. Had they been unable to reach a consensus on the special finding as to those two defendants, the jury undoubtedly would have informed the court in accordance with the court's instructions.

While deliberating, the jury also posed a question to the court about the count 5 verdict and special finding forms. It asked why there were two verdict forms for count 5. The court explained, *"You should find in your packets verdict forms for all three defendants for Count 5, two of them. One is styled the verdict form and one is styled a special finding form.* The verdict form is the form you use in determining whether the evidence shows beyond a reasonable doubt that any or all of the defendants are guilty of the crime charged in Count 5, which is intimidating a witness. . . .[¶] If you find any of the defendants guilty of the crime charged in Count 5, only then do you have to determine whether the special finding applies." (Emphasis added.)

The court's response to the jury's question makes clear that one verdict form and one special finding form applied to each defendant, and not, as Duran and Sisneros argue, that one verdict form applied to each defendant and three special finding forms applied to Vasquez.

The jury, moreover, orally confirmed its decision on the count 5 special findings in court. After reading the guilty verdicts on count 5 as to each defendant, the court read the jury's special findings attached to that count and asked the jury foreperson to orally confirm the findings. The following exchange took place between the court and the jury foreperson:

"THE COURT: It is a special finding. [¶] Count 5, the guilty verdict for dissuading a witness with a special finding now for Count 5 that it was malicious

and done with force or violence or the threat of force or violence, the special finding as to Mr. Vasquez is true, dated the 24th signed by the foreperson.  [¶]  Is that special finding the special finding of the entire jury?

> "JUROR NO. 6 [FOREPERSON]: Yes.

> "THE COURT: The same special finding regarding Mr. Duran, true, dated the 24th signed by the foreperson.  [¶]  Is that the special finding of the entire jury?

> "JUROR NO. 6 [FOREPERSON]: Yes.

> "THE COURT: And the same for Mr. Sisneros, Count 5, special finding, it is true, dated the 24th and signed by the foreperson.  [¶] Is that the special finding of the entire jury?

> "JUROR NO. 6 [FOREPERSON]: Yes."

After the verdicts and special findings were read, each juror individually confirmed that the court had correctly read the jury's verdicts and special findings.

Duran and Sisneros' argument that the jury's oral confirmation does not provide clarity on the jury's true intent regarding the special finding is without merit.  It is irrelevant that the judge who presided over taking the jury's verdicts was not the judge who presided over the trial. Duran and Sisneros' counsel, moreover, agreed that the substitute judge need not read each verdict or special finding form verbatim.  The court specifically asked whether it could, for each count, read one verdict or special finding form and then characterize the remaining forms to identify what was happening by count, charge, and verdict.  All counsel acquiesced in the court's proposed procedure.

On this record, we conclude that the jury's intent to find the count 5 special finding true for each defendant unmistakable.  Duran and Sisneros, thus, did not receive an unauthorized life sentence for dissuading a witness by force or threat of force convictions.

*Id*. at 17-19 (citations omitted).

In *Apprendi v. New Jersey*, the U.S. Supreme Court considered whether the Due Process

Clause "requires that a factual determination authorizing an increase in the maximum prison

sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a

reasonable doubt."  530 U.S. 466, 468 (2000).  The Supreme Court held that, "[o]ther than the

fact of a prior conviction, any fact that increases the penalty for a crime beyond the proscribed

maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. But, as the Court of Appeal reasonably concluded, despite a clerical error, the jury found the special finding true, and thus Sisneros fails to demonstrate a violation of *Apprendi* or its progeny.

Federal law allows a trial court to correct clerical and inadvertent errors on a verdict form to reflect the jury's true intent, even after the jury has been discharged.[8] *See United States v. Stauffer*, 922 F.2d 508, 513-15 (9th Cir.1990) (holding on direct criminal appeal that trial court's correction of jury verdict from acquittal to guilty to correct clerical error did not violate Double Jeopardy Clause); FED. R. CRIM.P. 36 (allowing courts to correct clerical error in judgment at any time after giving notice). Accordingly, federal courts have found on habeas review that state courts' denials of claims challenging trial judges' corrections of clerical errors on verdict forms were not contrary to or an unreasonable application of clearly established federal law. *See, e.g.*, *Camacho v. Rosa*, No. 09-cv-5527, 2010 WL 3952873, at *2-3 (C.D. Cal. Aug.18, 2010) (denying state prisoner's claim that trial court's error of giving wrong verdict form to jury entitled him to habeas relief because both counsel and judge referred to correct count throughout trial and jury was properly instructed); *Goins v. McDonald*, No. 09-CV-882, 2009 WL 4048601, at *7, *11 (E.D. Cal. Nov.20, 2009) (finding no clearly established Supreme Court precedent mandating that "typographical errors on a verdict form result in an unconstitutional sentence" or

---

[8]    Likewise, under California law, "technical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice." *People v. Webster*, 814 P.2d 1273 (Cal. 1991); *see also People v. Reddick*, 1 Cal. Rptr. 767, 776 (Cal. Ct. App. 1959) ("No particular form of verdict is required, so long as it clearly indicates the intention of the jury to find the defendant guilty of the offense with which he is charged"; "matters of surplusage and clerical errors will be disregarded.").

requiring sentence to be "consistent with the verdict form rather than as set forth in the charging

document and jury instructions"). Sisneros is not entitled to relief on this claim.

## B. Evidentiary Errors (Grounds 2-4)

Sisneros next alleges that the trial court made a number of evidentiary errors.[9] The

Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints

on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689

(1986). The Supreme Court has further made clear that federal habeas power does not allow

granting relief on the basis of a belief that the state trial court incorrectly interpreted the state

evidence code in ruling on the admissibility of evidence. *Estelle*, 502 U.S. at 72 (citing *Cupp v.

Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v.

DeChristoforo*, 416 U.S. 637, 643 (1974)).

The erroneous admission of evidence does not provide a basis for federal habeas relief

unless it rendered the trial fundamentally unfair in violation of due process. *Holley v.*

---

[9]     Sisneros' evidentiary claims all allege errors to his co-defendant Duran. Notably, because Duran's admitted statements did not directly implicate Sisneros, there is no *Bruton* issue here. *See Bruton v. United States*, 391 U.S. 123, 135-36 (1968) (holding that the admission of a statement of an accomplice or co-participant that implicates a defendant violates the defendant's Sixth Amendment rights when the defendant has no opportunity to cross-examine the co-participant). Moreover, petitioners generally lack standing to challenge the infringement of co-defendants' constitutional rights. *See, e.g*.,. Alderman v. United States, 394 U.S. 165, 174 (1969) (person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises lacks standing to challenge search on Fourth Amendment grounds); *Byrd v. Comstock*, 430 F.2d 937, 938 (9th Cir. 1970) (per curiam) (petitioner lacked standing to challenge co-defendant's statement obtained without requisite *Miranda* warnings because co-defendant's right against self-incrimination was personal to co-defendant). Respondents' opposition does not address whether Sisneros has standing to assert evidentiary errors committed with respect to Duran. Because the claims are without merit in any event, as discussed below, the Court will assume, without deciding, that Sisneros has standing to allege Grounds 2 through 4.

*Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  Evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence."  *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis omitted).  A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'"  *Mancuso v. Olivarez*, 292 F.3d 939, 956 (9th Cir. 2002), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000).

       i.      *Hearsay claim regarding Duran's prior juvenile adjudication*

Sisneros first argues that the trial court erred in failing to exclude evidence of Duran's juvenile robbery adjudication, which violated his right to due process by denying him a fundamentally fair trial.  The Court of Appeal recounted the following facts underlying this claim:

> Over defendants' objections, the trial court admitted evidence that Duran suffered a robbery adjudication in 2006 when he was a minor.  Detective Sample testified, based on information he obtained from the investigating officers, that a rival gang member escaped from a home after being held for two days by a group of Norteno gang members, including Duran, who tied him up, beat him, and demanded his ATM card so that they could withdraw money from his account to bail another jailed Norteno gang member out of jail.  Duran was arrested at the home where the rival gang member had been held; he was wearing red clothing.  The house contained Norteno gang graffiti. At the time, he told officers he only hung with Nortenos gang members.  Although Detective Sample acknowledged that no gang allegations were included in the robbery adjudication, in his opinion, the juvenile adjudication evidence showed Duran was a Norteno gang member that engaged in gang activities.
>
> Based on Detective Sample's testimony, defendants moved for a mistrial, arguing the evidence was highly inflammatory and exceeded the court's pre-set parameters for admitting such evidence.  The court denied the motion, finding the evidence more probative than prejudicial under Evidence Code section 352.

Docket No. 16-1 (Appellate Decision) at 28-29.

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ."  *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).  California employs a similar rule.  *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

In his Petition, Sisneros argues that the trial court erred in its balancing of evidence under Evidence Code § 352.  But to the extent that he argues that the admission of his prior convictions violated state law, Sisneros is not entitled to habeas relief.  *See Wilson v. Corcoran*, 562 U.S. 1, 4 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."); *Estelle*, 502 U.S. at 67-68.

Moreover, Sisneros cannot show that the trial court's ruling violated his constitutional rights.  "'The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process.'"  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995)); *see also Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir.1991) (proper analysis on federal habeas review is "whether the admission of the evidence so fatally infected the proceedings as to

render them fundamentally unfair"). "The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process." *Holley*, 568 F.3d at 1101. "Although the Court has been clear that a writ should issue when constitutional errors have rendered the trial fundamentally unfair [citation], it has not yet made a clear ruling that admission of irrelevant or overly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id.*

Similarly, to the extent Sisneros argues that the prior juvenile conviction inflamed the jury by suggesting either his or Duran's propensity to commit the present crime, the United States Supreme Court has never held clearly that the introduction of propensity evidence violates due process. *See Estelle*, 502 U.S. at 75 n. 5 ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"); *Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (rejecting habeas petitioner's challenge to propensity evidence, where petitioner could point to no Supreme Court precedent establishing that admission of otherwise relevant propensity evidence violated the Constitution).

In the absence of clearly established Supreme Court law on this issue, AEDPA relief is foreclosed. *See Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) ("it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (citations and internal quotations omitted); *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, . . . it cannot be said that the state court unreasonably applied clearly established Federal law") (citation, internal brackets and quotations omitted). Because

the Court of Appeal's rejection of this claim was not contrary to, or an unreasonable application of, any clearly established Federal law as determined by the United States Supreme Court, Sisneros' challenge to the admission of Duran's prior juvenile adjudication must fail.

ii.     *Confrontation claim regarding Duran's prior juvenile adjudication*

Sisneros similarly argues that the admission of hearsay evidence regarding Duran's juvenile adjudication violated his right to confrontation.  At trial, Detective Sample based his testimony on discussions he had with the officers who investigated the juvenile adjudication case and its underlying circumstances.  Sisneros argues that, because the evidence was not independently admitted and was from declarants who were not subject to cross-examination, its admission violated his right to confrontation.

The Confrontation Clause of the Sixth Amendment mandates that a criminal defendant has the right to confront and cross-examine the witnesses against him.  *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).  This generally means that out-of-court testimonial statements by a witness are not admissible against a defendant unless the witness is available for cross-examination at trial or the defendant had an opportunity to cross-examine the witness about the statements before trial.  *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  Under California law, however, "police officers testifying as gang experts" may properly base "their testimony on personal observations of and discussions with gang members as well as information from other officers and the department's files."  *People v. Olguin*, 37 Cal. Rptr. 2d 596, 602 (Cal. Ct. App. 1994) (internal quotation marks omitted), *overruled on other grounds in People v. Cromer*, 15 P.3d 243, 250 n.3 (Cal. 2001); *see also People v. Gonzalez*, 135 P.3d 649, 656 (Cal. 2006) (gang expert opinion may be based on citizen informants, police reports and gang member

contacts because these are reliable bases for opinion); *People v. Hill*, 120 Cal. Rptr. 3d 251, 268 (Cal. Ct. App. 2011) ("[G]ang expert may . . . rely on the hearsay statements of gang members.").

The Federal Rules of Evidence permit an expert to rely on inadmissible hearsay evidence as long as the evidence is of the kind experts in the field regularly consult. FED. R. EVID. 703; *see United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (holding that police officer possessing years of experience and special knowledge of gangs may qualify as expert witnesses); *see also United States v. Steed*, 548 F.3d 961, 976 n.13 (11th Cir. 2008) (noting that there exists no Supreme Court precedent pertaining to expert witness' reliance on otherwise inadmissible sources). Likewise, the Constitution does not prevent an expert from relying on hearsay to form his or her opinion. *See United States v. Beltran–Rios*, 878 F.2d 1208, 1213 (9th Cir. 1989) (stating that where a defendant is given ample opportunity to examine an expert whose opinion is based in part on hearsay, no confrontation clause violation occurs).

Based on the foregoing precedent, numerous federal courts have specifically held since *Crawford* that the introduction of otherwise inadmissible evidence in support of the testimony of a gang expert witness does not violate the Confrontation Clause. *See, e.g.*, *United States v. Palacios*, 677 F.3d 234, 243-44 (4th Cir. 2012); *Mundell v. Dean*, No. CV 11-7367, 2014 WL 7338819, at *6 (C.D. Cal. Dec. 22, 2014) ("[A] gang expert's reliance on hearsay evidence does not violate the Confrontation Clause where the underlying hearsay is not admitted for the truth of the matter asserted, but rather to explain the basis of the gang expert's opinion."); *Alejandre v. Brazelton*, No. C 11–4803, 2013 WL 1729775, at *10-11 (N.D. Cal. April 22, 2013) (expert witness' testimony concerning the meaning of defendant's tattoos based in part on hearsay

statements from undisclosed parolees did not violate Confrontation Clause); *Her v. Jacquez*, No. 2:09-cv-612, 2011 WL 1466868, at *33 (E.D.Cal. Apr. 18, 2011) (gang expert's testimony about specific gangs and their activities and membership, based on information imparted to him by others, did not violate Confrontation Clause because underlying information not offered for its truth but merely to support expert's opinion); *Walker v. Clark*, No. CV 08–5587, 2010 WL 1643580, at *15 n. 8 (C.D. Cal. Feb. 18, 2010) (citing cases); *Lopez v. Jacquez*, No. 1:09-cv-1451, 2010 WL 2650695, at *5 (E.D. Cal. July 1, 2010) ("[T]he Court does not find that an objective application of *Crawford* would result in a finding that the gang expert's reliance on hearsay testimony to explain his opinion that Petitioner was a member of the West Fresno Nortenos, and that the West Fresno Nortenos area criminal street gang, to be in violation of Petitioner's Confrontation Clause rights.").

Under these guidelines and existing precedent, the Court cannot find the state courts' rejection of Sisneros' confrontation claim unreasonable or contrary to Supreme Court authority.[10]

---

[10]     Notably, in rendering its opinion in Sisneros' case, the state court relied in part on *People v. Gardeley*, 927 P.2d 713 (Cal. 1996), which the California Supreme Court has subsequently disapproved in an opinion issued shortly after Sisneros' conviction was affirmed, *People v. Sanchez*, 374 P.3d 320 (Cal. 2016). In *Sanchez*, the California Supreme Court held that a gang expert may testify about his general knowledge but not about case-specific facts of which he has no personal knowledge. 374 P.3d at 327-28. It determined that such statements violate the Confrontation Clause if the hearsay is testimonial, unless there is a showing of unavailability and the defendant had a prior opportunity for cross-examination or forfeited that right by wrongdoing. *Id.* at 334-35 ("In sum, we adopt the following rule: When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay.").

The Court concludes that *Sanchez* does not establish a right to federal habeas relief here. First, the California Supreme Court's determination of federal constitutional law does not constitute "clearly established Federal law, as determined by the Supreme Court of the United States" and is not binding on this Court. *See Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004) ("Although lower federal court and state court precedent may be relevant when that precedent illuminates the application of clearly established federal law as determined by the United States

Detective Sample's testimony did not violate Sisneros' rights under the Confrontation Clause because it was not offered for the truth of the information asserted, but as a foundation for his expert testimony regarding Duran's criminal street gang membership. A review of the record indicates that whatever conversations Detective Sample may have had with other persons, he did not testify at Sisneros' trial as to the truth of the statements made by those persons. Rather, any such statements were used by Detective Sample merely to form the basis for his opinions. In this regard, the jury was specifically instructed that hearsay matters relied on by expert witnesses to form their opinions were not offered for the truth of those matters but were to be considered only in evaluating the basis of the expert's opinions. Further, as an expert, Detective Sample could properly base his opinion on inadmissible evidence, including hearsay, of a kind that experts in the field regularly consult.

Moreover, even if the statements relied on by Detective Sample in forming his opinion testimony could be considered testimonial in nature, their admission did not implicate Sisneros' right to confrontation. As the Fourth Circuit has explained:

_____

Supreme Court, if it does not do so, it is of no moment."); *Hernandez v. Small*, 282 F.3d 1132, 1140 (9th Cir. 2002) ("[D]ecisions of [the United States Supreme] Court are the only ones that can form the basis justifying habeas relief . . . ."). Further, even assuming that *Sanchez* is binding on this Court, it is nonetheless distinguishable from the facts of this case because, unlike in *Sanchez*, the information to which Detective Sample testified was not obtained in a testimonial setting. *See Peters*, 2013 WL 56988, at *9. Indeed, California courts have since interpreted *Sanchez* to bar expert-witness testimony only if it relates "to the particular events and participants alleged to have been involved in the case being tried." *See, e.g.*, *People v. Vega-Robles*, 224 Cal. Rptr. 3d 19, 43 (Cal. Ct. App. Mar. 7, 2017) (no *Sanchez* error in admitting gang-expert testimony about gang's history and founding because it constituted background information and not case-specific facts barred by hearsay rule). Sisneros does not contend that any of the information about Duran's juvenile adjudication related to the events at issue in the instant case.

The Court offers no opinion on the likely outcome of any state action Sisneros might pursue in light of *Sanchez*.

An expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation. Allowing a witness simply to parrot "out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion" would provide an end run around *Crawford*. *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007). For this reason, an expert's use of testimonial hearsay is a matter of degree. *See* Ross Andrew Oliver, Note, *Testimonial Hearsay as the Basis for Expert Opinion: The Intersection of the Confrontation Clause and Federal Rule of Evidence After Crawford v. Washington*, 55 HASTINGS L.J. 1539, 1560 (2004) (describing a "continuum of situations" in which experts rely on testimonial hearsay). The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay. As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no *Crawford* problem. The expert's opinion will be an original product that can be tested through cross-examination.

*United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009); *see also United States v. Law*, 528 F.3d 888, 911-12 (D.C. Cir. 2008) (finding no Confrontation Clause violation based on admission of an expert's testimony because the expert did not simply convey statements by other declarants); *but cf. United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (noting that police expert's testimony explaining inadmissible evidence he relied upon in reaching his conclusion may implicate the Confrontation Clause as the expert simply transmitted hearsay to the jury).

Here, a review of the record indicates that Detective Sample was not merely a transmitter of testimonial hearsay. Sisneros was given the opportunity to cross-examine Detective Sample regarding his opinions as well as the basis thereof, and the jury was able to judge the credibility of Sample's testimony in light of the sources he described in his testimony and upon which he relied.

Furthermore, a Confrontation Clause violation is subject to harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). A Confrontation Clause violation is

harmless, and does not justify habeas relief, unless it had substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th Cir. 2011). Here, the Court of Appeal concluded that, even if a confrontation violation occurred, it was harmless beyond a reasonable doubt. Docket No. 16-1 (Appellate Decision) at 35. This conclusion was both reasonable and fully supported by the record. As the Court of Appeal found, the "evidence was more than sufficient to establish defendants' Norteno gang ties and that the crimes were gang-related even if one disregards Detective Sample's testimony about Duran's juvenile adjudication." *Id.* at 40.

For these reasons, the Court does not find unreasonable or contrary to clearly established federal law the state courts' conclusion that Detective Sample's expert testimony, which relied in part on conversations with other officers regarding Duran's juvenile adjudication, did not violate Sisneros' rights under the Confrontation Clause. Accordingly, Sisneros is not entitled to federal habeas relief on this ground.

iii.    *Admission of Duran's booking statement regarding gang membership*

Sisneros further alleges that the trial court erred in admitting Duran's admission at booking that he was affiliated with a gang and a questionnaire form on which Duran indicated that he was a "Northerner." Sisneros claimed on direct appeal that the admission violated his Fifth Amendment privilege against self-incrimination. The California Court of Appeal did not decide whether the admission violated the defendants' Fifth Amendment rights but simply assumed a constitutional violation and found any error in the admission of Duran's booking

statements harmless under *Chapman v. California*, 386 U.S. 18, 24 (1967),[11] in light of the other

evidence in the case, which it recounted as follows:

> Here, Detective Sample opined that all three defendants were active Norteno gang members when they committed the charged, gang-related offenses. Defendants repeatedly yelled the word "Norte" or "Nortenos" during the attacks. Following the assaults on Fordyce and Lozano, defendants were arrested with two other individuals who were Nortenos. A red canvas belt, often worn by Norteno gang members, was found in Duran's car during a search of the vehicle. Police had contacted Sisneros several times with Norteno gang members while he was wearing red clothing. When being interviewed by police in this case, Sisneros admitted he "hood bangs" with Northerners, characterized himself as a "Northerner from the heights," and admitted that his family members had always been Northerners. Thus, Sisneros' later admission to jail classification officers that he "hangs with Northerners" was merely cumulative of other properly admitted evidence.
>
> While awaiting trial in this case, Duran and several Norteno gang members assaulted another Norteno member who wanted to drop out of the gang. Duran also yelled out the word "Norte" while be interrogated by police for the instant crimes. Vasquez had a Norteno gang tattoo on his chest, had been shot three months earlier at a gang party, had been contacted on multiple occasions associating with Norteno gang members, often wore red clothing indicative of the Nortenos, was photographed with other Norteno gang members throwing gang signs at a funeral for a documented Norteno gang member, and was suspected of passing a kite in jail containing Norteno curriculum or training materials while awaiting trial in this case.

Docket No. 16-1 (Appellate Decision) at 48-49.

In his Petition before this Court, Sisneros avers that the Court of Appeal incorrectly

applied the *Chapman* harmless error standard.

The United States Supreme Court has held that a state court's finding of harmless error

under *Chapman* is a decision "on the merits," and is, therefore, subject to AEDPA's deferential

standard of review. *See Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015). Moreover, upon

collateral review, a federal habeas court determines whether the error was harmless under the

---

[11]     *Chapman* provides that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24.

"actual prejudice" test from *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (an error will be harmless unless it has a "substantial and injurious effect or influence in determining the jury's verdict."). The Supreme Court and Ninth Circuit have both recognized that the *Brecht* test subsumes the AEDPA/*Chapman* test and should be applied when determining the prejudicial impact of federal constitutional error in a state-court criminal trial. *See Fry v. Pliler*, 551 U.S. 112, 120 (2007); *see also Ocampo v. Vail*, 649 F.3d 1098, 1114, n.17 (9th Cir. 2011).

Upon independent review, the Court concludes that the alleged error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623; *Winzer v. Hall*, 494 F.3d 1192, 1201 (9th Cir. 2007) (Confrontation Clause violations are subject to harmless error analysis); *see also Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010) (*Brecht* subsumes the harmless-beyond-a-reasonable-doubt *Chapman* standard and a federal habeas court ultimately makes its own independent harmless error determination under *Brecht*). In light of the evidence delineated above, which is fully supported by the record before this Court, Sisneros fails to satisfy the high *Brecht* harmless error standard.[12] Sisneros is therefore not entitled to relief on this claim.

---

[12] Other courts have admonished that harmless error review should not be confused with the sufficiency of the evidence inquiry required under *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). *See, e.g.*, *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. 2015) ("Time and time again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict."). The Court's reliance on the overwhelming evidence against Sisneros in finding any alleged error harmless does not simply focus on the sufficiency of the other evidence, but rather properly "look[s] at the influence the improperly admitted [evidence] had on the verdict," in light of a "host of factors," including the overall strength of the prosecution's case. *Id.* at 904 (citations omitted).

C.      **Sufficiency of the Evidence (Grounds 5-7)**

Finally, Sisneros challenges the sufficiency of the evidence on which his convictions for dissuading a witness by threat of force and active participating in a criminal street gang and the gang enhancement are based. As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546

U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos*, 132 S. Ct. at 3-4. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

i.     *Dissuading a witness by threat of force*

On direct appeal, the Court of Appeal explained the elements of the dissuading a witness charge:

> Section 136.1 prohibits someone from dissuading or attempting to dissuade a witness or victim from reporting a crime, or from attending or testifying at trial. (§ 136.1,

subds. (a)-(b).)  Where such conduct is accompanied by force or an express or implied threat of force or violence, the violation is a felony. (§ 136.1, subd. (c)(1).)

To prove defendants guilty of violating section 136.1, subdivision (c)(1), the People had to establish: (1) defendants knowingly and maliciously tried to prevent or discourage Cushing from reporting to law enforcement that Fordyce was a crime victim, or (2) defendants knowingly and maliciously tried to prevent or discourage Cushing from causing or seeking the arrest of someone in connection with the crimes against Fordyce; (3) Cushing was a witness or crime victim; and (4) defendants used force or threatened, either directly or indirectly, to use force or violence on the person or property of a witness or any other person. (§ 136.1, subds. (a)-(c).)

Docket No. 16-1 (Appellate Decision) at 21.

The appellate court subsequently concluded that ample evidence supported Sisneros'

conviction:

Evidence at trial showed the following: While defendants were beating Fordyce, one of them noticed Cushing on the phone and yelled out to alert the others that Cushing was likely calling the police.  All three defendants immediately got into Duran's car and sped across the parking lot to where Cushing and Lozano were standing.  Vasquez jumped out of the car, and using derogatory and threatening language, asked Cushing if he was calling the police.  Vasquez threatened to shoot Cushing and intimated he had a weapon in his waistband.  At the same time, Duran and Sisneros also got out of the car.  While Vasquez threatened to shoot Cushing, Duran and Sisneros charged at Cushing and began chasing him.  Having just witnessed all three men attacking Fordyce, Cushing fled for safety.

After Duran and Sisneros gave up chasing Cushing, they turned their attention to Lozano, who happened to be standing with Cushing when he was calling the police.  Both Duran and Sisneros viciously attacked Lozano, kicking and punching him in the head and chest.  It is undisputed that Cushing witnessed defendants attacking Fordyce.  By immediately getting in their car after noticing Cushing on the phone, racing towards Cushing in their vehicle, and jumping out to confront Cushing, the jury reasonably could have found that defendants were trying to stop Cushing from reporting the crime.

Vasquez's verbal threats to shoot Cushing for calling the police clearly qualify as an express threat of force or violence.  And, the jury reasonably could have determined that Duran and Sisneros' actions of chasing Cushing while he was on the phone constituted an express or implied threat to use force or violence to stop Cushing from calling the police.

*Id.* at 21-22.

Sisneros argues in his Petition, as he did on direct appeal, that the evidence did not establish that he made any threats. But all of the evidence in support of his claim was before the jury for its assessment. This Court is precluded from re-weighing the evidence or re-assessing witness credibility. *Schlup*, 513 U.S at 330; *Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004). The Court of Appeals' denial of this claim is both reasonable and fully supported by the record. Although it might have been possible to draw a different inference from other evidence, this Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326. Sisneros bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous. 28 U.S.C. § 2254(e)(1). He has failed to carry such burden. For the reasons persuasively stated by the Court of Appeal, the record does not compel the conclusion that no rational trier of fact could have found that Sisneros, by his act of chasing Cushing while he was on the phone, knowingly and maliciously attempted to prevent or persuade Cushing from calling the police, especially considering the double deference owed under *Jackson* and AEDPA. *See Valdez v. Clark*, 587 F. App'x 414, 414-25 (9th Cir. 2014). Sisneros is therefore not entitled to relief on this legal insufficiency claim.

 ii. *Substantive gang crime conviction/gang enhancement*

In the published portion of its decision, the Court of Appeal considered and rejected Sisneros' challenge to the substantive gang crime and the gang enhancement as follows:

> The substantive gang offense under section 186.22, subdivision (a) provides, "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished [as specified]." The gang enhancement imposes additional punishment for felony convictions "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).)

"The existence of a criminal street gang is unquestionably an element of both the enhancement and the substantive offense." Section 186.22, subdivision (f) defines "criminal street gang" as "any 'ongoing organization, association, or group of three or more persons' that shares a common name or common identifying symbol; that has as one of its 'primary activities' the commission of certain enumerated offenses; and 'whose members individually or collectively' have committed or attempted to commit certain predicate offenses."

While defendants' appeals were pending, the Supreme Court decided *Prunty*, which construed the definition of a "criminal street gang" under section 186.22, subdivision (f). *Prunty* also discussed the proof necessary to establish the existence of such a gang when the prosecution's theory turns on the conduct of one or more gang subsets. The analysis applies to both the substantive gang offense and the gang enhancements. We thus examine the effect of *Prunty* on defendants' appeals.

The defendant in *Prunty* identified as Norteno and specifically claimed the Detroit Boulevard set of the Nortenos as his own. He had shot at a perceived rival gang member at a Sacramento shopping center while uttering gang slurs and yelling the word "Norte." The prosecution sought to prove he committed the charged crimes to benefit the Sacramento-area Norteno street gang.

To establish the gang enhancement, the prosecution's gang expert testified about the Sacramento-area Norteno gang's general existence and origins, its use of shared signs, symbols, colors, and names, its primary activities, and the predicate activities of two local neighborhood subsets, the Varrio Gardenland Nortenos and the Varrio Centro Nortenos. The gang expert, however, did not provide any specific testimony connecting the subsets' activities to one another or to the Sacramento Norteno gang in general.

In reversing the gang enhancement for insufficient evidence, the Supreme Court found the prosecution failed to show a connection among the subsets it alleged comprised the criminal street gang. "[W]here the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets."

The court explained that the necessary "connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together." Evidence that "various subset members exhibit behavior showing their self-identification with a larger group" may also be sufficient to allow those subsets to be treated as a single organization. However the "prosecution chooses to demonstrate that a relationship exists," the evidence must show that "the gang the defendant sought to benefit, the individuals that the prosecution claims constitute an 'organization, association, or group,' and the group whose actions the prosecution alleges satisfy the 'primary activities' and predicate offense requirements of section 186.22(f), [are] one and the same."

*Prunty* provided several examples demonstrating how to establish the necessary connection between various subsets and an alleged larger gang for purposes of the gang

enhancement.  For more formal groups, evidence showing shared bylaws or organizational arrangements, shot callers who answer to a higher authority, or that the subsets routinely protect the same turf may prove the connection.

In situations where a group's structure is more informal, evidence showing various subsets collaborate to accomplish shared goals, strategize to carry out activities, or profess or exhibit loyalty to one another would be sufficient to imply the existence of a genuinely shared venture.  Evidence that gang subsets acknowledge one another as part of the same organization, coupled with evidence that the organization tends to operate in decentralized fashion in a relevant geographic area may also be sufficient.

Applying this framework to the evidence presented in *Prunty*, the Supreme Court first found that the prosecution sufficiently proved that the Sacramento-area Nortenos engaged in illicit primary activities since Detective Sample had testified that "'the Nortenos' in the area engage in various criminal practices, including homicide, assault, and firearms offenses."  We note that Detective Sample provided similar testimony here.

What the Supreme Court found lacking, however, was evidence regarding the necessary predicate offenses.  While the gang expert in *Prunty* referred to two offenses involving three alleged Norteno subsets, which he characterized as Nortenos, "he otherwise provided no evidence that could connect these groups to one another, or to an overarching Sacramento-area Norteño criminal street gang."

find the evidence regarding predicate offenses in this case decidedly different than the evidence–or lack of evidence—proffered in *Prunty*.  Expert gang testimony, coupled with other trial evidence, provided the required connection the Supreme Court found absent in Prunty.

The People's theory below was that the "criminal street gang" defendants sought to participate in and benefit was the larger Sacramento-area Norteno criminal street gang, which consisted of several local neighborhood subsets–the same theory set forth in Prunty.  To prove the existence of this larger criminal street gang, the prosecution proffered predicate crimes committed by certain subset members.  Defendants contend insufficient evidence links defendants and the subsets to this larger "criminal street gang." We disagree.

Officer Herrera, a gang investigator for the West Sacramento Police Department, testified to two predicate offenses–referred to as the Memorial Park predicates–committed by a West Sacramento subset of the Norteno street gang known as the Broderick Boys.  Officer Herrera linked the West Sacramento subset to the defendants and the larger Sacramento-area criminal street gang through photographic evidence.

Given their "RVN" tattoos, the evidence showed that Vasquez and his brother Luis Vasquez claimed the Richardson Village Nortenos set from the Del Paso Heights area.  Pictures posted on a Richardson Village Norteno MySpace page as well as Vasquez's personal MySpace page showed West Sacramento Norteno gang members, including Norteno gang members affiliated with the Broderick Boys.

Vasquez and other West Sacramento Norteno gang members are seen in several pictures throwing Norteno gang signs and wearing red attire. Ryan Boyd (also known as Ryan White or Derek White), who was arrested with defendants, is also pictured.  Several

of the pictures were taken at the funeral of Frank White, a well-documented Norteno gang member. Sisneros admitted knowing Frank White when he was arrested.

From this evidence, a jury reasonably could have concluded that Norteno subsets in West Sacramento associate with other Norteno subsets including the Richardson Village Norteno subset in Del Paso Heights. Members of both sets attended the funeral of a "well-documented" Norteno gang member. Such conduct shows a loyalty not only to their particular set but also an association with the larger Norteno street gang as a whole.

The funeral pictures, we believe, also prove that "members of two gang subsets 'hang out together' and 'back up each other,'" thus demonstrating that "the subsets' members have exchanged strategic information or otherwise taken part in the kinds of common activities that imply the existence of a genuinely shared venture." As Officer Herrera testified, part of the Sacramento-area Norteno criminal street gang's activities include "all get [ting] together for functions" such as "funerals."

Based on his experience as an expert in Hispanic criminal street gangs, Officer Herrera also testified that different Norteno sets comingle, hang out with each other, and often commit crimes together. Officer Herrera responded "yes" when asked whether it was "fair to say that Nortenos of any set, whether it be Del Paso Heights or Broderick Boys . . . follow the same ideology," and "use the same signs and symbols," including the number 14.

Detective Sample similarly testified that the violent acts of one Norteno subset help or benefit other sets under the rubric of the larger Norteno criminal street gang. When one set commits a violent crime, other members associated with the same umbrella gang receive the same fear and respect from the crime.

The evidence showed that the crimes were committed in West Sacramento, and that the defendants called out "Norte" or "Nortenos" during the attacks rather than any particular Norteno subset. Evidence also established that Sisernos used to live in West Sacramento, and now self-identified as a "Northerner from the heights." Such evidence tends to show that Norteno gang members can move fluidly among various gang territories, and that a gang member claiming one subset or area, such as Vasquez identifying himself as a Richardson Village Norteno through his tattoo and Sineros characterizing himself as a "Northerner from the heights," may commit crimes in the territory of other Norteno subsets. The jury, moreover, reasonably could have concluded that by calling out "Norte" during the vicious attacks on the nongang member victims in this case, the umbrella Norteno organization benefitted as the victims and other people in the community were more likely to attribute the attack to the Norteno criminal street gang in general.

Finally, Detective Sample testified that even though Norteno gang members may belong to different sets or subsets, their "foremost allegiance is to the Nortenos gang, aside from their set or subset." They demonstrate such allegiance through their shared use of the same colors, the same monikers, the same letters, and the same identifying symbols linking them to the larger Norteno gang.

This evidence sufficiently shows the behavior and practices of both West Sacramento Nortenos, including the Broderick Boys, and Del Paso Heights Nortenos

such as the Richardson Village Nortenos, which could reasonably lead the jury to conclude the subsets shared an association with each other and the larger Sacramento-area Norteno criminal street gang. This stands in stark contrast to the evidence in *Prunty*, where the gang expert simply "described the subsets by name, characterized them as Norteños, and testified as to the alleged predicate offenses." . . . .

    As the Supreme Court emphasized in *Prunty*, "[t]he key is for the prosecution to present evidence supporting a fact finder's reasonable conclusion that multiple subsets are acting as a single 'organization, association, or group.'" We find the prosecution satisfied that burden here.

*Vasquez*, 202 Cal. Rptr. 3d at 752-57 (citations omitted).

    Under both California and federal law, an expert may offer opinion testimony to assist the trier of fact in understanding certain evidence or determining certain issues. *See* CAL. EVID. CODE § 801(a); FED. R. EVID. 702. In both California and federal courts, gang culture has been considered an appropriate subject for expert testimony. *See, e.g.*, *United States v. Padilla*, 387 F.3d 1087, 1094 (9th Cir. 2004) (allowing exert testimony concerning gang punishment for junior members who fail to support senior members); *In re Frank S.*, 46 Cal. Rptr. 3d 839, 842 (Cal. Ct. App. 2006) ("It is well settled that a trier of fact may rely on expert testimony about gang culture and habits to reach a finding on a gang allegation."); Detective Sample's testimony falls within the recognized scope of permissible expert testimony as to gang culture, habits, and motivation.

    In his Petition, Sisneros challenges his substantive gang conviction by arguing that there was insufficient evidence to establish that he was affiliated with a gang. In support, he points to alleged inconsistencies in the evidence. But again, this Court is precluded from re-weighing the evidence or re-assessing witness credibility. *Schlup*, 513 U.S at 330; *Bruce*, 376 F.3d at 957-58. As the Court of Appeal reasonably concluded, a reasonable juror could have found beyond a reasonable doubt that, in light of Detective Sample's expert testimony and the evidence before

the jury, Sisneros was guilty of the substantive gang crime of actively participating in a criminal street gang, in violation of Penal Code § 186.22(a).

Sisneros also challenges the gang enhancements by arguing that there was insufficient evidence to establish the existence of a "criminal street gang" for purposes of the gang offense and the gang enhancements. In support of his claim, Sisneros again cites to the California Supreme Court's decision in *People v. Prunty*, 355 P.3d 480, 483 (Cal. 2015), which held that the prosecution is required "to introduce evidence showing an associational or organizational connection that unites members of a putative criminal street gang." In that case, the Supreme Court determined that the prosecution had failed to introduce specific evidence showing that certain subsets of the Norteno gang identified with the larger Norteno group, or that the Norteno subsets shared a connection with each other, or any other Norteno-identified subset, such that one subset's activities could be imputed to another subset. *Id.* at 484.

In his Petition, Sisneros argues that "[h]ere, as in *Prunty*, the missing evidence relates to the predicate offenses relied on by the prosecution in an attempt to meet the elements for the gang enhancement." But this Court is bound by the California Court of Appeal's ruling that, under California law, the "evidence sufficiently shows the behavior and practices of both West Sacramento Nortenos, including the Broderick Boys, and Del Paso Heights Nortenos such as the Richardson Village Nortenos, . . . could reasonably lead the jury to conclude the subsets shared an association with each other and the larger Sacramento-area Norteno criminal street gang," in contrast to the evidence presented in *Prunty*. *Vasquez*, 202 Cal. Rptr. 3d at 756; *see Emery v. Clark*, 643 F.3d 1210, 1215-16 (9th Cir. 2011) (per curiam) (overruling prior Ninth Circuit precedent interpreting the gang enhancements in the California Penal Code and recognizing "the

California Supreme Court's authoritative interpretation"); *see also Hicks v. Feiock*, 485 U.S. 624, 629–30 & n. 3 (1988) (noting that a state appellate court's determination of state law is binding and must be given deference); *West*, 311 U.S. at 237 ("This is the more so where, as in this case, the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court.").

Moreover, even if Sisneros could show that the California courts erroneously applied *Prunty* to his case, again, federal habeas relief is unavailable for violations of state law or for alleged errors in the interpretations or application of state law. *Swarthout v. Cooke*, 131 S. Ct. 859, 561-62 (2011). Sisneros fails to identify any authority of the U.S. Supreme Court that the Court of Appeal's rejection of his claim either contravenes or unreasonably applies. In the absence of such authority, Sisneros is not entitled to relief.

## V. CONCLUSION AND ORDER

Sisneros is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); 9th Cir. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: April 30, 2018.

   /s/James K. Singleton, Jr.       
JAMES K. SINGLETON, JR.
Senior United States District Judge
